**Louise J. HAMLET, Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 94–5118.

United States Court of Appeals, Federal Circuit.

Aug. 17, 1995.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Oct. 27, 1995.

Alexander W. Bell, Lynchberg, VA, argued, for plaintiff-appellant.

Domenique Kirchner, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued, for defendant-appellee. Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Washington, DC and Charles F. Beall, Jr., Atty., Arlington, VA.

Before ARCHER, Chief Judge, MICHEL and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

Louise J. Hamlet appeals from the judgment of the United States Court of Federal Claims[1] dismissing her action for lack of jurisdiction. *Hamlet v. United States*, No. 281–86C (Fed.Cl. Mar. 23, 1994). We affirm.

I

Since the pertinent facts in this case are set forth in detail in *Hamlet v. United States*, 14 Cl.Ct. 62, 63–64 (1988) (*CFC Hamlet I* ),

---

1. Effective October 29, 1992, the United States Claims Court became the United States Court of Federal Claims. Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506, 4516. Although Hamlet initiated her action in the Claims Court in 1986, we refer to the trial court by its current name.

and in *Hamlet v. United States,* 873 F.2d 1414, 1415 (Fed.Cir.1989) (*CAFC Hamlet I* ), only a summary of the facts is necessary.

Hamlet was employed as a program assistant in the Charlotte County, Virginia office of the Agricultural Stabilization and Conservation Service (ASCS) from November 19, 1956, until her removal on November 4, 1985. This ASCS county office, like all such offices, operated under the aegis of the United States Department of Agriculture (USDA) as set forth in the ASCS organic statute, the Soil Conservation and Domestic Allotment Act, Pub.L. No. 461, 49 Stat. 1148 (1935) (codified as amended at 16 U.S.C. § 590h (1988)).

After her removal, Hamlet requested and received appeal hearings before the Virginia State ASCS Committee and the National ASCS office. Her removal was upheld. Subsequently, on May 5, 1986, Hamlet filed suit in the Court of Federal Claims, claiming that she was entitled to relief under the Tucker Act, 28 U.S.C. § 1491(a)(1) (1988 & Supp. V 1993).[2] She alleged that her removal (1) violated her rights under the First and Fifth Amendments of the U.S. Constitution; (2) breached her employment contract; and (3) did not comply with the rules and regulations of the USDA and the ASCS rules found in the ASCS Handbook: County Office Personnel Management, 22–PM (Rev. 1) (1985) (22–PM Manual). Hamlet sought reinstatement and backpay.

The Court of Federal Claims dismissed Hamlet's action for lack of subject matter jurisdiction and for failure to state a claim. *CFC Hamlet I,* 14 Cl.Ct. at 67–68. This court vacated the judgment of the Court of Federal Claims and remanded the case "for further consideration or for trial." *CAFC Hamlet I,* 873 F.2d at 1417. We held that, under *United States v. Hopkins,* 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976), Hamlet's claim for breach of contract was sufficient under the Tucker Act to withstand a motion to dismiss for lack of jurisdiction,

reasoning that Hamlet might be able to prove facts entitling her to relief based on her allegations that an implied-in-fact contract had been created by the 22–PM Manual provisions covering her employment and that this contract was breached as a result of her removal. *CAFC Hamlet I,* 873 F.2d at 1417. We also held that the Court of Federal Claims erred in dismissing Hamlet's regulatory claim for reinstatement and backpay since the court did not consider the 22–PM Manual provisions governing her employment. *Id.* We further held that Hamlet's constitutional claim should not have been dismissed because, unlike the situation in *United States v. Connolly,* 716 F.2d 882 (Fed.Cir. 1983) (*en banc* ), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984), where the plaintiff's claim was based solely on the First Amendment, Hamlet relied additionally upon the backpay, compensation and reinstatement rights contained in the 22–PM Manual. *CAFC Hamlet I,* 873 F.2d at 1416–17.

Upon remand, the Court of Federal Claims conducted an initial proceeding concerning the implied-in-fact contract issue on February 14, 1992, and held a trial on the merits on July 13, 1992. After Hamlet presented her case, the Government moved to dismiss the action. The Court of Federal Claims dismissed the action, holding that (1) Hamlet did not prove that an express or implied contract, if one existed, had been breached; (2) Hamlet did not prove that the 22–PM Manual regulations had been violated; and (3) she did not prove that her constitutional rights were violated by any government policies or procedures. *Hamlet v. United States,* No. 281–86C, slip op. at 4–5 (Cl.Ct. Oct. 2, 1992) (*CFC Hamlet II* ). After her motion for reconsideration was denied, Hamlet again appealed to this court. This court explained that the Government's motion to dismiss was actually a motion under Rule 52(c) of the Rules of the United States Claims Court and, therefore, the Court of Federal Claims was required to make adequate findings of fact

---

2. The Tucker Act states, in pertinent part:

 The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any

Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

and conclusions of law to support its judgment. This court vacated and remanded the case because the Court of Federal Claims' "findings of fact and conclusions of law [were] insufficient to enable meaningful appellate review." *Hamlet v. United States,* No. 93–5075, slip op. at 2, 14 F.3d 613, 1993 WL 481140 (Fed.Cir. Nov. 23, 1993) (*CAFC Hamlet II* ).

Upon remand, the Court of Federal Claims held that Hamlet did not satisfy her burden of proof in establishing the existence of a contract or the breach of that contract. *Hamlet v. United States,* No. 281–86C, slip op. at 4 (Fed.Cl. Mar. 21, 1994) (*CFC Hamlet III* ). The court also held that the 22–PM Manual does not have the "force and effect of law" under *Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), and thus could not be interpreted to mandate the payment of money damages for purposes of the Tucker Act, under *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976). *CFC Hamlet III,* slip op. at 4–6. The Court of Federal Claims then *sua sponte* examined its jurisdiction over Hamlet's cause of action and concluded that jurisdiction was lacking under the Tucker Act. *Id.* at 6–8.

II

■ This court reviews *de novo* a dismissal by the Court of Federal Claims for lack of subject matter jurisdiction. *Transamerica Ins. Corp. v. United States,* 973 F.2d 1572, 1576 (Fed.Cir.1992). "The Tucker Act, of course, is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). In order to invoke jurisdiction under the Tucker Act, a plaintiff must point to a substantive right to money damages against the United States. *Id.* Hamlet's complaint contained three counts, each alleging a substantive right to compensation from the United States: (1) a breach of contract claim; (2) a violation of agency regulation claim; and (3) a claim that her re-

moval violated her constitutional rights. After examining each of these counts in turn, we conclude that the Court of Federal Claims lacked jurisdiction to hear each respective count under the Tucker Act.

III

■ This court has stated that there is a "well-established principle that, absent specific legislation, federal employees derive the benefits and emoluments of their positions from appointment rather than from any contractual or quasi-contractual relationship with the government." *Chu v. United States,* 773 F.2d 1226, 1229 (Fed.Cir.1985). In earlier proceedings in this case, we noted that, under the Tucker Act, "if Hamlet's employment was by 'appointment,' a breach of contract action against the government would be precluded." *CAFC Hamlet I,* 873 F.2d at 1417 n. 5 (citing *Hopkins,* 427 U.S. at 128, 96 S.Ct. at 2511–12; *Army & Air Force Exch. Serv. v. Sheehan,* 456 U.S. 728, 738, 102 S.Ct. 2118, 2124, 72 L.Ed.2d 520 (1982)). In *Sheehan,* the Supreme Court examined the record and the relevant agency regulations and concluded that the respondent in that case was employed by appointment, rather than by contract, and, thus, the Tucker Act did not confer jurisdiction over the respondent's contract claim against the United States for money damages. *Sheehan,* 456 U.S. at 735–37, 102 S.Ct. at 2122–24.

Hamlet argues that the 22–PM Manual constitutes a binding employment contract and that the Government's breach of this contract entitles her to money damages against the United States and establishes jurisdiction under the Tucker Act. We must reject this contention. Under the provisions of the 22–PM Manual,[3] all ASCS county employees are employed by appointment. Paragraph 95(A) of the 22–PM Manual states that "[p]ermanent appointments shall be used for the employment of FULL–TIME or PART–TIME employees who are expected to work more than one year." In fact, the 22–PM Manual only mentions employment by contract in one provision (¶ 91), which states

---

3. In support of her breach of contract argument, Hamlet relies solely on various provisions of the

version of the 22–PM Manual that was in effect at the time of her removal in 1985.

that ASCS county offices should "obtain professional janitorial services through contract." Such distinction between contract service employees and other employees strongly suggests that Hamlet and other non-janitorial employees of the ASCS county offices are employed by appointment, not by contract. *See, e.g., Hopkins,* 427 U.S. at 128–29, 96 S.Ct. at 2511–12. Additionally, under ¶ 465 of the 22–PM Manual, only employees serving under appointment are eligible to participate in the Civil Service Retirement System (CSRS), and under ¶ 628, only employees serving under a permanent appointment may enroll in a federal health benefits program. The record shows that Hamlet was both covered by the CSRS and enrolled in the Federal Employees Health Benefits program.

Consequently, we hold that Hamlet's employment with the ASCS was by appointment and not by contract. Nothing in the record rebuts the presumption that a federal employee is employed by appointment and not by contract or quasi-contract. *See Chu,* 773 F.2d at 1229. Thus, Hamlet's breach of contract count does not provide for a substantive right to money damages and cannot provide for jurisdiction under the Tucker Act.

## IV

Hamlet asserts that the 22–PM Manual constitutes an enforceable agency regulation and that certain provisions of the 22–PM Manual require the United States to compensate her for her removal. We disagree.

 The Supreme Court has stated that:

> [t]he basis of [a] federal claim—whether it be the Constitution, a statute, or a regulation—does not create a cause of action for money damages unless ... that basis "in itself ... can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained."

*Testan,* 424 U.S. at 401–02, 96 S.Ct. at 955 (quoting *Eastport Steamship Corp. v. United States,* 372 F.2d 1002, 1008–09, 178 Ct.Cl. 599 (1967)). Therefore, in order to invoke jurisdiction under the Tucker Act, Hamlet must show that (1) the 22–PM Manual was an enforceable "regulation of an executive department," *see* 28 U.S.C. § 1491(a)(1); and (2) the provisions of the 22–PM Manual can be fairly interpreted to create a substantive right to monetary compensation from the United States. After examining the pertinent provisions of the 22–PM Manual and analyzing the law regarding the validity of manuals and handbooks as regulations, we conclude that the 22–PM Manual is not an enforceable regulation.

## A

The Soil Conservation and Domestic Allotment Act, Pub.L. No. 461, 49 Stat. 1148 (1935) (codified as amended at 16 U.S.C. § 590h (1988)), provides for the creation and operation of the ASCS program and the ASCS county and community committees, and specifically states that "[t]he Secretary [of Agriculture] shall make such regulations as are necessary relating to the selection and exercise of the functions of the respective committees, and to the administration, through such committees, of such programs." 16 U.S.C. § 590h(b). In accordance with this statute, the USDA promulgated and published regulations governing the ASCS county and community committees. *See* 7 C.F.R. §§ 7.1–.38 (1994). These published regulations set forth the rules for the selection and conduct of the ASCS state, county and community committees. 7 C.F.R. §§ 7.1–.27.

In accordance with these regulations, the ASCS created the 22–PM Manual and distributed it to all state and county offices. The 22–PM Manual provides instructions to state and county ASCS offices "on all phases of the personnel management program for County Office employees and committee members." 22–PM Manual, ¶ 1. The 22–PM Manual states that it was promulgated in accordance with and under the authority of the Soil Conservation and Domestic Allotment Act and the regulations governing ASCS county and community committees. *See* 22–PM Manual, ¶ 7.

The provisions of the 22–PM Manual establish procedures for the hiring and classification of candidates for employment in the county offices. The 22–PM Manual also sets forth the pay schedule for county employees;

eligibility requirements for pay increases; overtime, leave and severance pay policies; and the basic standards of employee conduct. The Manual also outlines the procedures and grounds for a separation of an employee for misconduct. *See* 22–PM Manual, ¶ 444. Before an employee can be removed, the employee must be given notice of and an opportunity to respond to a suspension action. 22–PM Manual, ¶¶ 444, 447. Only after an employee has been suspended and receives notice of removal and an opportunity to reply, can an employee then be removed. 22–PM Manual, ¶ 448. After a removal for misconduct, the removed employee has a right to an informal appeals hearing at the state committee, and then has a right to an appeal and a formal hearing before the Deputy Administrator of the ASCS (or a designee). 22–PM Manual, ¶¶ 451–53. An employee who is suspended but not yet removed may be reinstated by the county committee with the approval of the state committee, or by the state committee. 22–PM Manual, ¶ 454. Although this provision seems to imply that an employee cannot be reinstated once the employee is removed, other provisions show that an employee can be reinstated after removal. Paragraph 455 of the 22–PM Manual provides that an employee who is restored to duty is entitled to backpay for the period of suspension and separation and to a restoration of benefits retroactive to the date of termination.[4] Therefore, according to the 22–PM Manual, an employee who has been separated may be reinstated and, if so, is entitled to backpay. It is this backpay provision upon which Hamlet bases her Tucker Act claim.

### B

■ Whether the 22–PM Manual qualifies as a "regulation of an executive department" for Tucker Act purposes is a complex ques-

tion. In its decision below, the Court of Federal Claims simply held that, since the 22–PM Manual was not promulgated in accordance with the strict requirements of the Administrative Procedures Act (APA), 5 U.S.C. § 552(a)(1) (1994), "it cannot be accorded the dignity of regulations." *CFC Hamlet III*, slip op. at 6 (quoting *Hedman v. United States*, 15 Cl.Ct. 304, 314 n. 25 (1988), aff'd, 915 F.2d 1552 (Fed.Cir.1990)).[5] However, the reasoning of the Court of Federal Claims is flawed. The APA specifically states that, for matters "related solely to the internal personnel rules and practices of an agency," an agency is not obligated to abide by the requirements of section 552, such as publication in the Federal Register. 5 U.S.C. § 552(b)(2) (1994). Moreover, for "a matter relating to agency management or personnel," an agency is not obligated to abide by the notice-and-comment rule-making procedures of the APA. 5 U.S.C. § 553(a)(2) (1994). Therefore, since the 22–PM Manual is a personnel manual, it does not necessarily lose its status as a regulation simply because it was not promulgated and published in accordance with the requirements of the APA.

Obviously, not every piece of paper released by an agency can be considered a regulation entitled to the force and effect of law. *See Piccone v. United States*, 407 F.2d 866, 877, 186 Ct.Cl. 752 (1969) (Nichols, J., concurring); *Doe v. Hampton*, 566 F.2d 265, 280–81 (D.C.Cir.1977). However, several courts have held that an agency manual or handbook can be a binding agency regulation. In *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), the Supreme Court held that an agency employee's removal was invalid because it violated the United States Department of State's Manual of Regulations and Procedures. The Court

---

4. The pertinent part of ¶ 455 reads as follows:
 An employee under permanent appointment who is restored to duty ... is eligible for backpay as follows:
 (1) Backpay shall be at the rate that the employee would have earned had the employee remained on the rolls.
 (a) Pay compensation to employee for the period of suspension and separation, minus any amount earned by the employee during

the period, including unemployment compensation.

5. The footnote relied upon by the Court of Federal Claims in the present case was written in the lower court's decision in *Hedman*. This court, in affirming the judgment in *Hedman*, 15 Cl.Ct. 304, did not discuss the status of the 22–PM Manual as a regulation. *See Hedman v. Department of Agriculture*, 915 F.2d 1552 (Fed.Cir.1990).

held that the unpublished manual, promulgated in accordance with the relevant executive order and statute, was binding on the Department. *Id.* at 374–76, 77 S.Ct. at 1158–59. Similarly, in *Vitarelli v. Seaton,* 359 U.S. 535, 538–40, 79 S.Ct. 968, 971–73, 3 L.Ed.2d 1012 (1959), the Court held that the Department of Interior was required to comply with the procedural standards set forth in an internal order before dismissing an employee, even though in the absence of such standards the employee could have been dismissed summarily. The Court treated the provisions of the informal order as "regulations." *Id.* at 539–40, 79 S.Ct. at 972–73. Moreover, in *Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 274–76, 89 S.Ct. 518, 522–23, 21 L.Ed.2d 474 (1969), the Court held that a circular distributed by the Department of Housing and Urban Development (HUD) was binding on the Department since the circular was issued pursuant to the agency's general rule-making powers and was intended by the agency to be mandatory. The Court evaluated the circular as "an administrative regulation." *Id.* at 276, 89 S.Ct. at 523.

■ In *Piccone,* 407 F.2d at 871–72, the court held that a government employee's removal was invalid because provisions of the Navy Civilian Personnel Instructions had been violated. In his concurrence, Judge Nichols directly confronted the issue of whether an unpublished (i.e., not promulgated under the procedures set forth in the APA) manual or document of a government agency could be considered a "regulation." He stated that "whether [any piece of paper emanating from an agency] is a regulation would seem to depend in part on its contents and in part on agency intent ascertained by extrinsic evidence." *Id.* at 877 (Nichols, J., concurring). Additionally, in *Doe v. Hampton,* 566 F.2d 265, 280–81 (D.C.Cir.1977), the court held that provisions of the Federal Personnel Manual may be binding on the Government if the author of the manual so intended, even if the manual was not published in the Federal Register. The intent of the promulgator should be ascertained by an examination of the provision's language, its context, and any available extrinsic evidence. *Id.* at 281.

■ In contrast, other court decisions have held that a provision of a manual or handbook is not a regulation that would be binding on the Government. In *Khuri v. United States,* 154 Ct.Cl. 58, 1961 WL 8723 (1961), the court held that provisions of the Foreign Service Manual were not binding on the Government. Although the court considered the provisions to be "regulations," the court determined that the Department of State did not intend the manual to be mandatory, but rather intended it to be a guide, setting forth general policies and principles. *Id.* at 64. Similarly, in *Caterpillar Tractor Co. v. United States,* 589 F.2d 1040, 1043, 218 Ct.Cl. 517 (1978), the court held that a Department of Treasury handbook for exporters constituted "interpretive regulations" and, thus, was not binding on the Government. The court in *Fiorentino v. United States,* 607 F.2d 963, 968–69, 221 Ct.Cl. 545 (1979), found that a provision of a HUD employee manual was not a binding regulation because it contravened a statute. In *Donovan v. United States,* 433 F.2d 522, 523–24 (D.C.Cir.1970), the court determined that certain provisions of the unpublished Federal Aviation Administration employee handbook were advisory and not mandatory and, thus, not binding.

Indeed, this court has, on several occasions, stated that provisions of the Federal Personnel Manual (FPM) were not binding regulations. In *Griessenauer v. Department of Energy,* 754 F.2d 361, 364 (Fed.Cir.1985), we found that a provision of the FPM, which stated that an employee's resignation "should" be by written resignation, was precatory and not mandatory. We held that this provision and similar provisions of the FPM "do not create any rights in an employee," and are not binding on the Government. *Id.* See also *Collins v. Merit Sys. Protection Bd.,* 978 F.2d 675, 678 (Fed.Cir.1992). Similarly, in *Johnson v. Merit Systems Protection Board,* 812 F.2d 705, 711 (Fed.Cir.1987), we held that a provision of the FPM, which stated that an agency "should make every effort to take back a former employee who was retired for disability," "merely establishes a 'policy' for agencies to follow" and "does not create any rights in the [employee]." In *Horner v. Acosta,* 803 F.2d 687, 694–95 (Fed.Cir.1986), we refused to give

effect to a provision of the FPM Supplement since that provision had been made obsolete by a statutory enactment. In *Horner v. Jeffrey*, 823 F.2d 1521, 1528–30 (Fed.Cir. 1987) (*en banc*), the court rejected the contention that a provision of the FPM Supplement, classifying service as a midshipman as "military service" for credit purposes, should be accorded the status of a regulation. The court first suggested that it was doubtful that the FPM provisions in general could achieve the status of law since the FPM provisions are "interpretive" and not "substantive." *Id.* at 1529–30 (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 301–04, 99 S.Ct. 1705, 1717–19, 60 L.Ed.2d 208 (1979)) [6]. Looking at the specific provision in question, the court found it to be interpretive and thus not controlling. *Jeffrey*, 823 F.2d at 1530. Additionally, the court stated that the provision was invalid as contrary to statute. *Id.* at 1530–31.

▆ In light of the foregoing, we conclude that, regardless of whether a provision of an agency's personnel manual or handbook was published or promulgated under the standards set out in the APA, such provision is a regulation entitled to the force and effect of law if (1) the promulgating agency was vested with the authority to create such a regulation; (2) the promulgating agency conformed to all procedural requirements, if any, in promulgating the regulation; (3) the promulgating agency intended the provision to establish a binding rule; and (4) the provision does not contravene a statute. In determining whether a provision was intended to be binding, the court should consider (a) whether the language of the provision is mandatory or advisory; (b) whether the provision is "substantive" or "interpretive"; (c) the context in which the provision was promulgated; and (d) any other extrinsic evidence of intent.

## C

As mentioned above, the Soil Conservation and Domestic Allotment Act granted the USDA the authority to promulgate regulations relating to the selection and operation of the ASCS county and community committees. *See* 16 U.S.C. § 590h. Additionally, the USDA regulations, published in the Code of Federal Regulations, give the Deputy Administrator of the ASCS the authority to issue official instructions and procedures to implement the provisions of the published regulations. *See* 7 C.F.R. §§ 7.35, 7.36. Therefore, the ASCS was vested with the authority to create the 22–PM Manual, which sets forth the instructions and procedures concerning the selection, hiring, pay, benefits, responsibilities, and removal of county and community committee members and employees.

Also, as discussed above, since the 22–PM Manual relates to matters of agency personnel, its promulgation was exempt from the strict procedural requirements found in the APA. Congress imposed no other procedural requirements for the promulgation of such an employee manual. Therefore, on the record before us, the 22–PM Manual is not

---

**6.** Since agency personnel manuals and handbooks are expressly exempt from the procedural requirements of the APA, the structural distinction in the APA, *see* 5 U.S.C. §§ 553(b), 553(d), between "substantive rules" and "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," as discussed in *Chrysler*, is not controlling. However, we think the distinction is helpful to our analysis.

In *Chrysler*, the Court held that, in order for an APA regulation to have the "force and effect of law," it must satisfy three requirements: (1) it must be a "substantive rule"; (2) Congress must have granted the agency authority to create such a regulation; and (3) the regulation must be promulgated in conformity with any procedural requirements imposed by Congress. 441 U.S. at 301–03, 99 S.Ct. at 1717–18. The Court noted that a "substantive rule" was a "legislative-type rule," "affecting individual rights and obligations." 441 U.S. at 302, 99 S.Ct. at 1718 (citing *Morton v. Ruiz*, 415 U.S. 199, 232, 236, 94 S.Ct. 1055, 1073, 1075, 39 L.Ed.2d 270 (1974)). For our analysis, if a provision of an agency's personnel manual or handbook constitutes such a "substantive rule," it is far more likely to be considered a binding regulation for purposes of Tucker Act jurisdiction than if the provision were in the category of "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." In this analysis, "substantive" includes procedural requisites in manuals or handbooks for the removal of an agency employee, such as the procedural requirements held to be binding in *Service v. Dulles*.

infirm for reasons of its process of promulgation.

The provision of the 22–PM Manual upon which Hamlet relies is the backpay provision (¶ 455), reproduced in pertinent part in note 4, *supra.* That provision states that a permanent appointee who is restored to duty is eligible for backpay, and backpay "shall be at the rate that employee would have earned had the employee remained on the rolls." This language is certainly mandatory and not merely advisory. Moreover, the provision is "substantive" since it purports to create a reinstated employee's right to receive backpay. Also, the Government's own witness, Mr. Teto, the Assistant Personnel Officer for the Human Resources Management Division in ASCS, testified that the provisions of the 22–PM Manual "are the agency regulations. They are to be followed." In light of this evidence and the language and content of the backpay provision, we conclude that the ASCS intended the provision to be binding on the agency.

However, we also find that the backpay provision contravenes a congressional statute and, therefore, it cannot be an enforceable regulation. First, we note that because ASCS county employees are appointed by the county executive director and because the director is appointed by the county committee, which is comprised of elected members of the county's farming community, such ASCS county employees are not included within the definition of "employee" in 5 U.S.C. § 2105(a) (1994). *See Hedman v. Department of Agric.,* 915 F.2d 1552, 1554 (Fed. Cir.1990). By its own terms, section 2105(a) constitutes the definition of "employee" for all of Title 5, unless otherwise specifically modified. Therefore, ASCS county employees cannot recover backpay under the Back Pay Act, 5 U.S.C. § 5596 (1994), since that Act resides in Title 5 and it does not modify the definition of "employee."

Accordingly, we must infer a congressional intent to forbid backpay to this class of ASCS employees. Our reasoning follows that of the Supreme Court in *Army & Air Force Exchange Service v. Sheehan,* 456 U.S. 728, 740–41, 102 S.Ct. 2118, 2125–26, 72 L.Ed.2d 520 (1982), where the Court noted that employees of the Army and Air Force Exchange Service were explicitly excluded from the definition of employee in 5 U.S.C. § 2105 and were thus precluded from bringing a cause of action under the Back Pay Act.[7] The Court stated that "Congress' intent to prohibit a backpay claim by a Service employee would obviously be subverted if the employee could sue under the Tucker Act whenever he asserted a violation of the Service's regulations governing termination." *Sheehan,* 456 U.S. at 740–41, 102 S.Ct. at 2125. Although ASCS county employees are not explicitly excluded from the definition of "employee" for purposes of coverage under the Back Pay Act, they nevertheless equally fail to satisfy the definition of "employee" because they are appointed by the county executive director, who is not an "employee" within the statutory definition. Thus appointed, ASCS county employees are not "employees" under section 2105 as a matter of law. *See Hedman,* 915 F.2d at 1555. Congress obviously understood that this class of employees fall outside the definition in section 2105 because, when Congress has chosen to confer the benefits of employee status on ASCS county employees, it has done so in express terms. *Id.* at 1554–55 & n. 1 (noting that ASCS county employees are expressly covered under certain federal programs, such as the Civil Service Retirement System and the health insurance benefits program). In view of Title 5's "elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations," *Bush v. Lucas,* 462 U.S. 367, 388, 103 S.Ct. 2404, 2417, 76 L.Ed.2d 648 (1983), Congress' exclusion of ASCS county employees from the Back Pay Act evidences a clear intent to preclude such employees from receiving backpay. *See United States v. Fausto,* 484 U.S. 439, 447, 108 S.Ct. 668, 673–74, 98 L.Ed.2d 830 (1988). Therefore, we conclude that Congress delib-

---

7. Employees of the military exchange services are expressly excluded from the definition of "employee" for the purpose of coverage under the laws administered by the Office of Personnel Management (OPM). 5 U.S.C. § 2105(c)(1) (1994). The Back Pay Act is a law administered by OPM.

erately chose to exclude ASCS county employees from the Back Pay Act.

Because ¶ 455 of the 22–PM Manual purports to give backpay to ASCS county employees who are reinstated after removal or suspension, it contravenes Congress' intent to preclude such employees from receiving backpay. Hence, under the test set forth above, this provision of the 22–PM Manual cannot be considered an enforceable "regulation of an executive department." Therefore, the provision cannot be the basis for invoking the Tucker Act jurisdiction of the Court of Federal Claims under the rule set out in *Testan.*

V

Hamlet also argues that her removal violated her rights under the First and Fifth Amendments of the Constitution. However, such constitutional claims "standing alone," i.e., without an underlying statutory or regulatory right to recovery, "cannot be interpreted to command the payment of money," and therefore cannot support the Court of Federal Claims' jurisdiction under the Tucker Act. *United States v. Connolly,* 716 F.2d 882, 886–87 (Fed.Cir.1983) (*en banc*); *see also CAFC Hamlet I,* 873 F.2d at 1416–17. Since Hamlet's contract and regulatory claims are insufficient to secure Tucker Act jurisdiction, her constitutional claims alone cannot invoke such jurisdiction.

VI

Accordingly, we hold that the Court of Federal Claims lacked jurisdiction over Hamlet's cause of action, and her action was properly dismissed. Hamlet argues that such a decision would unfairly preclude her and all ASCS employees from obtaining judicial review of adverse personnel actions. However, a former federal employee does not have an inherent right to judicial review of her removal. *See Fausto,* 484 U.S. at 448–49, 452, 108 S.Ct. at 674–75, 676; *see also Carter v. Gibbs,* 909 F.2d 1452, 1456–57 (Fed. Cir.1990) (*en banc*). In *Fausto,* the Court held that the "integrated scheme of adminis-

trative and judicial review" in Title 5 barred review by the Court of Federal Claims of a claim for backpay by a nonpreference member of the excepted service, despite the fact that such employees had no right to judicial review of adverse personnel actions under Chapter 75 of Title 5. *Fausto,* 484 U.S. at 445, 447, 455, 108 S.Ct. at 672–73, 673–74, 677–78. Hence, we cannot grant federal employees access to the courts beyond that provided in Title 5 itself. *Carter,* 909 F.2d at 1455–56. Hamlet is not entitled to judicial review where Congress has not granted it, and her claim must be dismissed.[8]

No costs.

*AFFIRMED.*

---

**8.** Since a court may *sua sponte* question its jurisdiction at any time, we reject Hamlet's conten-

tion that the Court of Federal Claims violated the Mandate Rule and the Law of the Case doctrine.