# Authority of the Environmental Protection Agency to Hold Employees Liable for Negligent Loss, Damage, or Destruction of Government Personal Property

The Environmental Protection Agency may hold its employees liable for the negligent loss, damage, or destruction of government personal property or for the unauthorized personal use of agency-issued cell phones.

May 28, 2008

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
ENVIRONMENTAL PROTECTION AGENCY

You have asked whether the Environmental Protection Agency ("EPA") may hold its employees liable for the negligent loss, damage, or destruction of government personal property or for the unauthorized personal use of agency-issued cell phones. We conclude that it may.

## I.

EPA's policy on the treatment of government personal property is contained in the agency's Personal Property Policy & Procedures Manual ("Property Manual"), available to employees on the agency Intranet. The Property Manual constitutes the "authoritative reference for EPA's management of personal property." *Id.* at ES-1. Describing itself as a "supplement" to existing federal law and regulations, the Property Manual "provid[es] basic policy and procedures governing the personal property management of EPA." *Id.* at ES-1 to ES-2. Pursuant to the Property Manual, EPA employees are responsible for "properly caring for, handling, utilizing, and being accountable for EPA personal property assigned for their use within or away from an EPA facility," as well as for "ensuring that personal property in their possession, custody or control is used only for official authorized duties (except as allowed per EPA Order 2100.3, 'Policy on Limited Personal Use of Government Office Equipment.')." *Id.* § 1.3.4.

EPA's Property Manual expressly provides that employees may be held liable for any government property in their care that is lost, damaged, or destroyed through their negligence. The Property Manual both notifies employees of their duty of care and requires them to acknowledge that responsibility by completing certain forms before taking custody of EPA property. One form requires employees receiving personal property, like laptops and cell phones, to "accept responsibility for the equipment," to agree to "exercise reasonable care in protecting it," and to accept that they "may be required to reimburse EPA for part or all of the acquisition cost" in case the property is lost, damaged, or destroyed due to negligence. EPA Form 1740-22 ("Personal Property Custody Card"); *see also*

Property Manual § 2.1.3 (describing the purpose of EPA Form 1740-22). Another form requires employees transporting property outside EPA facilities to sign a notice that they will be "personally responsible" for the property and "if the property has been lost, damaged, or destroyed because of [their] negligence, a Board of Survey may find [them] at fault." EPA Form 1700-9 ("Property Pass"); *see also* Property Manual § 2.2.1 (discussing the use of short- and long-term property passes for taking EPA personal property offsite). A third form requires employees transferring EPA personal property to other areas to accept that they are "personally responsible for [its] return in the condition in which received, normal wear and tear excepted . . . [and if] because of [their] negligence, the property has been lost, damaged or destroyed, EPA is hereby authorized to withhold any salary due [the employees] until full restitution is made." EPA Form 1740-10 ("Property Action Request and Memorandum Receipt"); *see also* Property Manual § 2.4.1 (describing the purpose of EPA Form 1740-10).

EPA provides its policy governing the appropriate use of cell phones in an administrative order entitled "Policy on Limited Personal Use of Government Office Equipment," which is available to employees on the agency Intranet. EPA Order 2100.3 A1 (2004). The order sets the parameters of authorized use (allowing limited personal use during non-work time where such use causes "minimal additional expense to the Government" and does not "reduce . . . productivity") and states that "[u]nauthorized or inappropriate use of Government office equipment may result in [adverse consequences, including] . . . financial liability, depending on the severity and nature of the misuse." *Id.*

EPA's Property Manual sets forth specific administrative procedures for reviewing claims that employees should be held liable for the loss, damage, or destruction of agency property (referred to in the Manual as "LDD"). Under these procedures, a Board of Survey, composed of three to five EPA employees appointed for three-year terms, "serves as a fact-finding body charged with determining the circumstances and conditions of each case in which EPA property is declared LDD." Property Manual § 1.3.2. The Board "must ensure that facts are fully disclosed, government interests are fully served, and the rights of the employee(s) involved are fully protected." *Id.* § 3.8.4. The Board must consider the available evidence, including a custodial report "describing the circumstances of the LDD," *id.* § 3.8.2, and must interview the "employee(s) assigned responsibility for the property and/or their supervisor," *id.* § 3.8.4. Following such consideration, the Board must issue "comprehensive" written findings and recommendations, including a determination of whether the employees were "at fault" for the loss, damage, or destruction. *Id.* § 3.8.6. The Board's findings and recommendations then must be reviewed by a senior-level EPA official ("Program/Regional leadership"), *id.* § 3.8.7, and if the senior official disagrees, a specified agency property officer must act as an advisor to "facilitate resolution of the case between all parties," *id*.

## II.

Federal departments and agencies may appeal to several sources of authority to promulgate rules concerning their employees' care for government property. Most directly, 5 U.S.C. § 301 provides the heads of "Executive departments" with a general "housekeeping" authority to prescribe rules for the conduct of their department's employees and "the custody, use, and preservation of its records, papers, and property." Although EPA is not an "Executive department" within the meaning of section 301, *see* 5 U.S.C. § 101 (2006) (defining "Executive departments"), we conclude that the Administrator of the EPA has the same "housekeeping" authority under EPA's organic statute.

Under 5 U.S.C. § 301, "[t]he head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property." 5 U.S.C. § 301 (2006). Commonly referred to as a "housekeeping statute," section 301 gives "authority to [an] agency to regulate its own affairs." *Chrysler Corp. v. Brown*, 441 U.S. 281, 310 (1979). "[T]he antecedents of 5 U.S.C. § 301 go back to the beginning of the Republic, when statutes were enacted to give heads of early Government departments authority to govern internal departmental affairs." *Id.* at 301. This Office has interpreted section 301 to allow agencies not only to set rules for employee conduct while on the job, but also to regulate employee conduct outside the workplace that "may undermine the efficient operation of the Department or the effectiveness of employees in the performance of their duties." *Authority to Prescribe Regulations Limiting the Partisan Political Activities of the Commissioned Officer Corps in the National Oceanic and Atmospheric Administration*, 28 Op. O.L.C. 102, 104 (2004) ("*Authority to Prescribe Regulations*").

If section 301 applied to the EPA, we would have no difficulty concluding that it would confer authority to "prescribe regulations" setting standards of care for employee use of government property and to impose liability for breaches of those standards. The Property Manual and EPA Order 2100.3 regulate both the "custody, use, and preservation of . . . [EPA] property" and "the conduct of its employees." 5 U.S.C. § 301. These rules thus concern "internal departmental affairs," *Chrysler*, 441 U.S. at 301, and would constitute a proper exercise of "administrative power" pursuant to the statute, *United States v. George*, 228 U.S. 14, 20 (1913), which includes the authority to establish penalties for violations of agency regulations, *see Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 372, 376 (1973) (holding that an agency's authority to regulate certain conduct included the authority to impose penalties, such as a civil fine, for violating agency regulations). For this reason, several departments and agencies have cited section 301

expressly as a source of authority for rules subjecting employees to liability for losses due to violations of internal personnel and property rules.[1]

The difficulty here, however, is that section 301 confers regulatory authority only on the "heads of Executive departments and military departments," and not the heads of other executive agencies, such as EPA. 5 U.S.C. § 301; *see also* 5 U.S.C. § 101; *Authority of the Office of Government Ethics to Issue* Touhy *Regulations*, 25 Op. O.L.C. 13, 15 (2001) (recognizing that section 301 authority is limited to the listed departments). In considering whether the EPA Administrator may exercise housekeeping authority equivalent to that under section 301, we must consider whether such authority has been conferred under EPA's organic statute.

The Reorganization Plan establishing the EPA vests the Administrator with authority equivalent in many respects to that enjoyed by the head of an executive department. Reorganization Plan No. 3 of 1970, § 1(b), 84 Stat. 2086, 2086 (July 9, 1970) (codified at 5 U.S.C. app. 189 (2006)).[2] The Reorganization Plan, which names the Administrator the "head of the agency," *id.*, transfers to the Administrator functions previously vested by law in the heads of other executive departments, including functions of the Secretary of the Interior and the Secretary of Health, Education, and Welfare. *Id.* § 2(a)(1)–(4). The Administrator's authority is not limited to those designated functions but also includes "[s]o much of the functions of the transferor officers and agencies" that are "incidental to or

---

[1] *See, e.g.*, Dep't of Justice, Order 2400.3 (Aug. 6, 1998) (citing section 301 as legal authority for its policy providing that "[a]ll employees . . . [s]hall be liable for violation of their [property management] responsibilities when they result in losses to the Government through gross negligence"); Bureau of Land Management Manual § 1520 (providing that "[e]mployees may be held financially liable for loss, damage, destruction, or theft of property items" and citing 5 U.S.C. § 301 for authority) (available at www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/blm_manual.Par.53408.File.dat/1520.pdf, last visited ca. 2008); National Aeronautics and Space Administration, Policy Directive 2540.1F, § 1.g (May 25, 2005) ("Unauthorized or improper use of Government office equipment could result in . . . criminal penalties, and/or employees/contractors being held financially liable for the cost of improper use.") (invoking 5 U.S.C. § 301) (available at http://code210.gsfc.nasa.gov/NPD2540001F.pdf, last visited Aug. 12, 2014). Other agencies have adopted similar rules without expressly citing 5 U.S.C. § 301. *See* U.S. Agency for International Development ("USAID"), *ADS Chapter 518—Personal Property Management (Domestic)* (revised May 5, 2007) (available at www.usaid.gov/policy/ads/500/518.pdf, last visited ca. 2008); Dep't of the Interior, Interior Property Management Directive 114-60.808-1 (available at www.doi.gov/pam/114-60-8.html, last visited ca. 2008) (stating that "employees *will* be held financially liable when a thorough investigation determines . . . [t]hat the property loss was a result of [misuse] . . . or ordinary neglect or negligence") (emphasis in original); U.S. Forest Service Manual § 6500.2 (clarifying that "[i]ndividuals are liable to the Government . . . [if] [t]he Government suffers a pecuniary loss due to their willful or unauthorized acts"); U.S. Fish & Wildlife Service Manual, 310 FW 1 (June 13, 1996) (available at www.fws.gov/policy/310fw1.html, last visited ca. 2008) ("Employees who have been determined by a Board of Survey to be negligent in the use of such property may be held personally liable to make financial restitution to the Government for any incurred loss").

[2] Reorganization Plan No. 3 was transmitted to Congress on July 9, 1970, and became effective on December 2, 1970, pursuant to chapter 9 of title 5, 5 U.S.C. §§ 901 *et seq.*

necessary for . . . the performance of," or "primarily related to," such functions. *Id.* § 2(a)(9). This ancillary authority includes "authority, provided by law, to prescribe regulations relating primarily to the transferred functions." *Id.* At the time of the Reorganization Plan, such ancillary authority included the housekeeping authority conferred by 5 U.S.C. § 301 on the heads of those departments to enable their subordinates to carry out efficiently the statutory functions transferred to the Administrator of EPA. *See* 5 U.S.C. § 301 (Supp. II 1966). To perform those transferred functions, the Reorganization Plan further provides that the Director of OMB shall transfer to EPA "personnel, property, records, and unexpended balances of appropriations . . . used, held, available, or to be made available in connection with the functions transferred to the Administrator or the Agency." Reorganization Plan No. 3 of 1970, § 4(a).

Taken together, these provisions convey to the Administrator all of the housekeeping authority available to other department heads under section 301, including authority to adopt property management regulations. Congress has vested the Administrator with the authority to run EPA, to exercise its functions, and to issue regulations incidental to the performance of those functions. This grant includes the authority to assign responsibility to others within the agency and to issue regulations prescribing the standards by which those functions are to be performed. The effective and efficient management of the agency's personnel and property is plainly "incidental to" and "necessary for" the performance of the functions that the Administrator is charged with performing. Indeed, the Reorganization Plan specifically recognizes this authority by providing the Administrator not only with transferred functions but with the personnel and equipment necessary for the effective performance of those functions. The Administrator's authority to prescribe standards for the care and use of agency property also includes the authority to enforce those standards by holding employees liable for losses that occur due to the breach of those standards. *See Mourning*, 411 U.S. at 372. Accordingly, we conclude that the Administrator has the regulatory authority to issue property management regulations.[3]

---

[3] In view of this conclusion, we need not discuss at length EPA's authority under the two other sources identified in your letter: (1) 5 U.S.C. § 7301 (2006), which recognizes the President's authority to "prescribe regulations for the conduct of employees in the executive branch," and (2) the common law principle of bailment. *See* EPA Letter at 3. Both sources remain potential avenues under which EPA could seek to impose liability on its employees, albeit subject to certain procedural hurdles. Pursuant to 5 U.S.C. § 7301, the President has delegated to the Office of Government Ethics ("OGE") the authority to ensure that federal employees "protect and conserve Federal property" and do "not use it for other than authorized activities." Exec. Order No. 12731, §§ 101(i), 201 (Oct. 17, 1990), 3 C.F.R. 306 (1990 Comp.). OGE in turn has issued a series of regulations authorizing agencies to issue supplementary property regulations, 5 C.F.R. § 2635.105(a), with which employees must comply or face "corrective action," which can include restitution, *id.* § 2635.103. To rely on these OGE regulations to support its existing property regulations, EPA would have to submit those regulations for OGE's approval and have them published alongside OGE regulations in the Federal Register. *See*

We also conclude that the rules contained within the Property Manual and EPA Order 2100.3 constitute binding and enforceable regulations. If EPA had submitted these rules for notice and comment and published them in the *Federal Register*, there would likely be little ambiguity about whether they constituted regulations binding within the agency. EPA has not done so in this case, however, because the Administrative Procedure Act ("APA") expressly exempts rules related to internal agency governance from those procedural requirements.[4] *See* 5 U.S.C. § 552(b) (2006) (exempting from disclosure requirements "matters that are . . . related solely to the internal personnel rules and practices of an agency"); *id.* § 553(a) (2006) (providing that formal rulemaking requirements, such as notice and comment procedures, are not required "to the extent that there is involved . . . a matter relating to agency management or personnel or to public property"); *see also Authority to Prescribe Regulations*, 28 Op. O.L.C. at 105–07 (concluding that a regulation concerning government employees' political activities was not a "substantive rule" subject to APA procedural requirements because it "would govern only the conduct of government employees and would not directly affect the rights and obligations of private parties pursuant to the regulatory jurisdiction of the Department"). Accordingly, the fact that EPA's rules were not promulgated in a notice and comment rulemaking process does not deprive them of legal effect; rather, as courts have held in analogous circumstances, an agency personnel manual may constitute a "regulation" that is binding within an agency even if "it was not promulgated and published in accordance with the requirements of the APA." *Hamlet v. United States*, 63 F.3d 1097, 1103 (Fed. Cir. 1995).

---

5 C.F.R. § 2635.105(b). The common law doctrine of bailment also may allow an agency to hold employees liable for damage to property caused by their misuse or neglect. *See United States v. Thomas*, 82 U.S. (15 Wall.) 337, 344 (1872); *see also* 3 General Accounting Office, *Principles of Federal Appropriations Law* 13-160 (2d ed. 1994) ("Redbook") (recognizing that "the concept of bailment" provides "the legal basis" for employee liability for damage to government personal property). There is some question, however, whether recovery on a theory of bailment would be available in the context of an employment relationship. *See, e.g.*, *Elwood v. Bolte*, 403 A.2d 869 (N.H. 1979) (explaining that "because [the employer] retained elements of control [over his property], a master-servant relationship was created rather than a bailment"); *see also* Am. Jur. 2d, *Bailments* § 17 (2d ed. 2007) (citing cases). Even if recoupment were appropriate, agencies likely would have to seek recovery through administrative procedures, either through informal agency adjudications or through the assistance of the Office of Personnel Management.

[4] As a general matter, regulations that "directly affect the rights and obligations of private parties" or regulate the "citizenry at large" constitute "substantive rules" under the APA and usually must be promulgated in accordance with notice and comment procedures. *Authority to Prescribe Regulations*, 28 Op. O.L.C. at 107. In contrast, agency rules "govern[ing] only the conduct of government employees" are not substantive rules within the meaning of the APA and are specifically excluded from publication and notice and comment requirements. *Id.* The EPA policies at issue here pertain solely to the conduct of EPA employees and have no application to the "citizenry at large." Those policies are therefore not "substantive rules" that must be published under the APA.

Whether statements contained within agency policy manuals constitute binding agency regulations is a question that has arisen in a variety of contexts. Although not every agency statement constitutes a binding regulation, "the general consensus is that an agency statement, not issued as a formal regulation, binds the agency . . . if the agency intended the statement to be binding." *Farrell v. Dep't of Interior*, 314 F.3d 584, 590 (Fed. Cir. 2002); *see also Thorpe v. Housing Auth. of Durham*, 393 U.S. 268, 276 (1969) (holding that a circular issued by the Department of Housing and Urban Development constituted an administrative regulation where it "was intended to be mandatory"); *Service v. Dulles*, 354 U.S. 363, 376 (1957) (holding that removal of employee was invalid because it violated procedures for removal set forth in a State Department manual that was binding on the Department); *Doe v. Hampton*, 566 F.2d 265, 280–81 (D.C. Cir. 1977) (holding that unpublished provisions within an agency personnel manual may be "binding if so intended by the Commission" in question). Applying this standard here, we believe that the EPA rules in question bind both the agency and its employees. The Property Manual describes itself as constituting the "*authoritative* reference for EPA's management of personal property" and states that it "provid[es] basic policy and procedures *governing* the personal property management of EPA." *Id.* at ES-1 (emphasis added). The Manual also expressly notes that it is a "supplement to the portions of the *Code of Federal Regulations (CFR)* and the *Federal Management Regulations (FMR)*" that provide the legal framework for the treatment of federal property. *Id.* at ES-1 to ES-2. Similarly, EPA Order 2100.3 A1 states that it "provides *the EPA policy* permitting limited personal use of Government office equipment during non-work time" and replaces "any previous memoranda and policies regarding personal use of Government office equipment." (Emphasis added.) Like the Property Manual, EPA Order 2100.3 A1 describes its status as on par with other binding legal authorities. *Id.* (stating that the order "supplements but does not supersede any statutes, regulations, or collective bargaining agreements on the authorized use of Government office equipment"). Accordingly, the EPA policies at issue make clear "that they were designed to be binding on the agency" and on employees alike. *Farrell*, 314 F.3d at 591. Those policies therefore qualify as regulations enforceable by EPA when agency property is damaged due to employee negligence or additional costs are incurred due to unauthorized use.[5]

---

[5] You also have asked whether EPA's authority to impose liability on its employees for the misuse or neglect of government property would be consistent with the Comptroller General's decision in *Matter of Department of Defense—Authority to Impose Pecuniary Liability by Regulation*, B-280764, 2000 WL 812093 (May 4) ("*Matter of DoD*"). We believe that it is, because *Matter of DoD* addressed the specific rules governing "accountable officers," rather than the general standards for other federal employees. (The decisions of the Comptroller General are not binding on the Executive Branch, although we do consider them useful sources on appropriations matters. *See Use of General Agency Appropriations to Purchase Employee Business Cards*, 21 Op. O.L.C. 150, 151 (1997).) The Comptroller General traditionally has

## III.

For the foregoing reasons, we conclude that EPA's rules regarding employee liability for loss, damage, or destruction of government personal property and for the unauthorized use of government personal property are supported by EPA's housekeeping authority.[6]

STEVEN A. ENGEL
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

recognized that agencies may adopt regulations holding their employees liable for damage to property caused by employee negligence or misuse. *See* 3 Redbook at 13-159. At the same time, the Comptroller General has recognized the existence of specialized liability standards governing so-called "accountable officers," those federal officers responsible for certifying and disbursing government funds. *Id.* at 13-157. Insofar as accountable officers may be responsible for certifying and disbursing government funds and traditionally have been held to the highest standards of care, GAO has recognized that the specific terms governing that liability are set by statute.

In *Matter of DoD*, the Comptroller General addressed whether an agency could hold employees who are not accountable officers liable for contributing to the wrongful disbursement of government funds. The Comptroller General explained that, while Congress had singled out certifying officers, 31 U.S.C. § 3528, and disbursing officers, 31 U.S.C. § 3325, as officials who would be strictly liable for improper payments, "significantly, [Congress had not] extended liability beyond these officers to governmental employees whose work support[ed] these functions." 2000 WL 812093, at *5. The Comptroller General thus reasoned that because Congress had specifically considered which officers could be liable for erroneous disbursements in this context, the omission of certain officers signaled Congress's intent that those officers *not* be held liable as accountable officers. In this regard, *Matter of DoD* expressly repudiated two prior decisions of the Comptroller General, both of which involved liability for accountable officers, *id.* at *5, but gave no indication that it intended to overrule the long line of Comptroller General decisions holding, as a general matter, that employees may be held liable for property damage based upon agency regulations. Likewise, GAO's subsequent discussion of *Matter of DoD* provides no indication that *Matter of DoD* worked a sea change in GAO's understanding of agencies' ability to assess liability against employees absent specific statutory direction. *See* 2 Redbook at 9-11 (3d ed. 2006) (recognizing that *Matter of DoD* simply departed from the view that the government could "impose *accountable officer* status and liability" by administrative action). Accordingly, we believe that *Matter of DoD* is consistent with our conclusion that EPA may enforce its regulations imposing liability on employees for misuse or neglect of government property.

[6] Because EPA's policy may result in a deprivation of an employee's property, EPA's procedures for determining employee negligence or misuse of property and assessing liability also must satisfy the constitutional requirement of due process. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (holding that due process requires balancing an individual's property interests and the risk of an erroneous deprivation against the government's interests, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail"). We note that as detailed in the Property Manual, EPA's procedures for assessing liability provide notice and an administrative hearing before a Board of Survey prior to the imposition of any liability, *see* Property Manual §§ 1.3.2, 3.8.3–3.8.4, two factors that the Supreme Court has identified as significant to the due process analysis.